IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

BAYLEE M. HESGARD                                                    PLAINTIFF

vs.                                     Civil No. 5:21-cv-05031

KILOLO KIJAKAZI, Acting Commissioner,[1]
Social Security Administration                                       DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Baylee M. Hesgard, brings this action pursuant to 42 U.S.C § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claims for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

**I.      Procedural Background:**

Plaintiff filed her applications for SSI and DIB on September 26, 2017, alleging an onset date of May 20, 1995, which was later amended to December 8, 2015.  (Tr. 15, 64, 97-98, 117-118, 136-137, 155-156).  Plaintiff – who is currently 26 – was 20 years old on the amended alleged onset date, and she had no past relevant work ("PRW").  (Tr. 28, Finding 7, Finding 9).

The Commissioner denied her applications both initially and upon reconsideration.  (Tr. 173-178, 182-185).  At Plaintiff's request (Tr. 186-193), an Administrative Law Judge ("ALJ")

---

[1] Kilolo Kijakazi became Acting Commissioner of the Social Security Administration on July 9, 2021.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted as the defendant in this suit.  No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

held an administrative hearing on February 19, 2020.  (Tr. 60-96).  Plaintiff was present and represented by counsel.

On May 5, 2020, the ALJ found Plaintiff had the following severe impairments: seizure disorder/staring spells/pseudo seizures; anxiety; mood disorder; conversion disorder; post-traumatic stress disorder ("PTSD"); and borderline personality disorder.  (Tr. 18, Finding 3).  The ALJ concluded that Plaintiff's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 19, Finding 4).  The ALJ determined Plaintiff retained the RFC to do the following:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations.  The claimant cannot be exposed to hazards such as motor vehicles, ladders, ropes, scaffolds, moving mechanical parts, unprotected heights, deep water, open flames, and use of firearms.  The claimant is able to perform unskilled work with occasional contact with supervisors and coworkers, but no contact with the general public other than incidental contact.  (Tr. 22, Finding 5).

With the assistance of a vocational expert ("VE"), the ALJ found Plaintiff could perform work as a packing line worker, housekeeping cleaner, and injection molding machine tender.  (Tr. 29).  She concluded Plaintiff had not been under a disability as defined by the Act from May 1995, through the date of the ALJ's decision, May 5, 2020.  (Tr. 29, Finding 11).  The Appeals Council denied Plaintiff's request for review on December 15, 2020.  (Tr. 1-3).  This matter is before the undersigned for report and recommendation.  Both parties have filed appeal briefs (ECF Nos. 14, 15), and the case is ready for decision.

## II.   <u>Applicable Law:</u>

This Court's role is to determine whether substantial evidence supports the Commissioner's findings.  *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010).  Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it

adequate to support the Commissioner's decision. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). A claimant must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months. The disability determination process is not an adversarial process; instead, the Commissioner's duty exists alongside the claimant's burden to prove her case. *See Noerper v. Saul*, 964 F.3d 738 (8th Cir. 2020).

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental

3

impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The fact finder only considers Plaintiff's age, education, and work experience in the light of her residual functional capacity if the final stage of the analysis is reached.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III.   Evidence Presented:

The Court has reviewed the entire medical record evidence.  Although the recitation herein is lengthier than ordinary, the Court includes the following:

On April 8, 2015, Plaintiff, age 19, was seen at Arkansas Children's Hospital for a follow-up appointment related to prior seizures.  (Tr. 398).  As of that time, Plaintiff had quit her education due to financial difficulties and was not driving due to seizures.  Dr. Jhablall Balmakund's impression of the appointment was seizure with a history of nonepileptic events; continued tonic-clonic[2] seizures at least once or twice a month; school difficulty because of financial difficulties and academic performance; possible poor sleep hygiene; staring spells; and differential diagnosis includes seizures versus daydreaming.  (Tr. 399).  Dr. Balmakund scheduled Plaintiff for an electroencephalogram ("EEG") and increased her Keppra medication to 2000 mg (two times a day).

---

[2] A grand mal seizure causes loss of consciousness and violent muscle contractions.  It's the type of seizure most people picture when they think about seizures.  A grand mal seizure – also known as a generalized tonic-clonic seizure – is caused by abnormal electrical activity throughout the brain.  Usually, a grand mal seizure is caused by epilepsy.  But sometimes, this type of seizure can be triggered by other health problems, such as extremely low blood sugar, a high fever, or a stroke.  Many people who have a grand mal seizure never have another one and don't need treatment.  But someone who has recurrent seizures may need treatment with daily anti-seizure medications to control and prevent future grand mal seizures.  *See* Grand mal seizure, at https://www.mayoclinic.org/diseases-conditions/grand-mal-seizure/sypmtoms-causes/syc-20363458 (last accessed Jan. 25, 2022).

Plaintiff returned to Arkansas Children's Hospital on August 17, 2015. (Tr. 395). Dr. Balmakund wanted to perform a day long video EEG monitor; however, Plaintiff's family never called back to schedule one. Plaintiff's Trileptal level was 14. Plaintiff reported one generalized tonic-clonic activity and admitted she could sleep well during the day but stayed up late at night. Dr. Balmakund was unsure if her sleep pattern was helpful. Plaintiff denied the use of tobacco or alcohol but had smoked marijuana.

On December 8, 2015, Plaintiff presented to Benton NeuroCare Inc. for an evaluation regarding her seizures and a routine EEG study. (Tr. 423-424). A 32 channel EEG recording was used and obtained without sleep deprivation. (Tr. 423). Digital spike detection program was used, and Plaintiff was cooperative during the study. Dr. Ahmad Al-Khatib opined the basic background rhythm in the resting stage was composed of relatively symmetrical, rhythmical, moderate amplitude 8-9 hertz ("HZ") frequency. This was seen over both posterior head regions which attenuated with eye opening. Periods of drowsiness were noted; sleep spindles/vertex complexes were observed; and transient burst of generalized spike and slow activities lasting for 5 seconds were noted. Hyperventilation for 2 minutes with good effort was obtained which did not induce any electrophysiological evidence of abnormal focal slowing or epileptiform activities. Photic stimulation at 3 to 33 HZ was performed which did not induce any definite electrophysiologic evidence of abnormal focal slowing or epileptiform activities. (Tr. 424). Ultimately, Dr. Al-Khatib concluded this was an abnormal EEG study due to the presence of one burst of epileptiform activities, which was consistent with the diagnosis of generalized epileptic disorder.

The same date, Plaintiff underwent an X-ray of her brain. (Tr. 442). Dr. David Jong opined Plaintiff's exam was negative.

On January 13, 2016, Plaintiff returned to Dr. Al-Khatib and reported that she experienced a general tonic-clonic seizure on January 2, 2016.  (Tr. 421).  Plaintiff reported episodes of staring off and poor responsiveness.  Plaintiff's physical exam findings were mostly normal, although, Dr. Al-Khatib noted her deep tendon reflex was brisk.  She was compliant with her medications and had no drowsiness or dizziness.  Dr. Al-Khatib's impression was generalized epileptic disorder.  As a result, Dr. Al-Khatib prescribed Keppra, Trileptal, Zarontin, and activated Plaintiff's Vagus Nerve Stimulator[3] ("VNS").

On January 20, 2016, Plaintiff returned to Dr. Al-Khatib and reported no seizure like activities.  Plaintiff was compliant with her medications and exhibited no drowsiness or dizziness.  Plaintiff's physical exam findings were the same as her previous appointment and Dr. Al-Khatib's impression was seizure disorder, status post ("S/P") VNS.

On February 17, 2016, Plaintiff was seen again by Dr. Al-Khatib.  (Tr. 419).  She was compliant with her medications, had no dizziness or drowsiness, and Dr. Al-Khatib's impression was unchanged.  Dr. Al-Khatib also adjusted Plaintiff's VNS and continued her current medications.

Plaintiff returned to Dr. Al-Khatib on March 16, 2016, reporting several spells of staring and poor responsiveness on a daily basis.  (Tr. 416).  Plaintiff also reported having a general tonic-clonic seizure on March 6, 2016.  Plaintiff tried her VNS magnet, but it did not abort her seizure.  Dr. Al-Khatib adjusted Plaintiff's VNS and his impression once again was seizure disorder, complex partial seizure, and S/P VNS.

---

[3] Vagus nerve stimulation involves the use of a device to stimulate the vagus nerve with electrical impulses.  An implantable vagus nerve stimulator is currently FDA-approved to treat epilepsy and depression.  There's one vagus nerve on each side of your body, running from your brainstem through your neck to your chest and abdomen.  *See* Vagus nerve stimulation, at https://www.mayoclinic.org/tests-procedures/vagus-nerve-stimulation/about/pac-20384565 (last accessed Jan. 25, 2022).

On April 5, 2016, Plaintiff returned to Benton NeuroCare Inc. (Tr. 415). Plaintiff had no further seizure like spells, dizziness, or drowsiness. Dr. Al-Khatib's impression was unchanged, and he continued Plaintiff's medications.

On May 17, 2016, Plaintiff returned to Dr. Al-Khatib and reported no general tonic-clonic seizures; however, she still experienced episodes early in the morning. (Tr. 414). Plaintiff admitted non-compliance with her medications and had no dizziness or drowsiness. Dr. Al-Khatib's impression was intractable complex partial seizure. Subsequently, Dr. Al-Khatib adjusted Plaintiff's VNS parameters and instructed her not to drive.

Plaintiff saw Dr. Al-Khatib on May 31, 2016, after suffering two general tonic-clonic seizures on May 29, 2016, and missing her medications. (Tr. 413). Plaintiff's VNS did abort her seizures and she was tolerating her VNS well. Dr. Al-Khatib's impression remained unchanged.

On June 29, 2016, Plaintiff returned to Dr. Al-Khatib and reported no further seizure like activities. (Tr. 412). She was compliant with her medications; exhibited no dizziness or drowsiness; and Dr. Al-Khatib's impression remained unchanged.

On August 14, 2016, Plaintiff underwent an abdomen AP supine radiograph. (Tr. 569). Dr. Douglas Elliot found no abnormalities and his impression was a negative exam.

On October 17, 2016, Plaintiff was seen by Dr. Al-Khatib for a follow-up appointment. (Tr. 410). Plaintiff had experienced a general tonic-clonic seizure on September 8, 2016, while compliant with her medications. She reported no dizziness or drowsiness, and Dr. Al-Khatib adjusted her VNS. However, Plaintiff complained of irritability and mood swings from her Keppra medication. Dr. Al-Khatib's impression remained unchanged since Plaintiff's last appointment.

Plaintiff next saw Dr. Al-Khatib on November 14, 2016, after having a seizure on October 31, 2016. (Tr. 411). Plaintiff's fiancé tried Plaintiff's VNS magnet, but it did not abort her seizure.

Dr. Al-Khatib adjusted Plaintiff's VNS; continued her current medications; and cautioned her not to drive.

On April 21, 2017, Plaintiff presented to Physician Specialty Hospital after falling off the second rung of a ladder and landing on her back and head.  (Tr. 553-554).  Melody McGuire, APRN, diagnosed Plaintiff with a contusion.  Plaintiff underwent a CT scan of her head and an x-ray of her thoracic spine.  (Tr. 555-556).  Dr. Joseph Yancey found no midline shift or mass lesion.  (Tr. 555).  There was no evidence for acute intracranial hemorrhage and no fractures were seen.  Dr. Yancey's impression was no intracranial process and he found no acute fracture or listhesis (slippage or spondylolisthesis) in the thoracic spine.  (Tr 556).

On April 24, 2017, Plaintiff returned to Dr. Al-Khatib and stated she had a seizure on March 31, 2017.  (Tr. 408).  She was compliant with her medications and her mood and behavior were back to baseline.  Dr. Al-Khatib's impression remained unchanged since Plaintiff's previous appointment.

Plaintiff saw Dr. Al-Khatib on May 20, 2017, complaining of behavioral disturbances resulting from her Keppra medication.  (Tr. 409).  She felt anger and rage but denied being suicidal.  Plaintiff experienced a seizure two weeks prior and had forgotten to take her medications.  Dr. Al-Khatib's impression was unchanged, and he added Briviact (twice a day) to her medications.

On May 31, 2017, Plaintiff returned to Dr. Al-Khatib and reported having a seizure with tongue bite on May 24, 2017.  (Tr. 407).  Plaintiff admitted missing her medications the prior day but reported medication compliance since the seizure with no dizziness or drowsiness.  Dr. Al-Khatib's impression remained unchanged, and he stressed compliance with medications.

Plaintiff was seen by Dr. Al-Khatib on July 5, 2017.  (Tr. 406).  Plaintiff had one general tonic-clonic seizure on June 26, 2017, reporting sleep deprivation but medication compliance.  Dr.

Al-Khatib adjusted Plaintiff's VNS, instructed her to continue with her medications, and cautioned her not to drive.

On August 3, 2017, Plaintiff returned to Dr. Al-Khatib and denied any seizure like activities since her previous appointment. (Tr. 405). She was compliant with medications and her diagnoses remained unchanged.

Two months later, Plaintiff saw Dr. Al-Khati, reporting one general tonic-clonic seizure on September 10, 2017, after missing her medications. (Tr. 404). Plaintiff was compliant with taking her medications since her seizure and exhibited no dizziness or drowsiness. Dr. Al-Khatib's impression remained unchanged, and he cautioned her not to drive.

On January 14, 2018, Plaintiff was admitted to Washington Regional Medical Center ("WRMC") after having multiple seizures. (Tr. 500). Emergency medical services ("EMS") reported Plaintiff had four seizures before her arrival at WRMC and one upon arrival. Plaintiff reported a history of seizures and confirmed she had been drinking alcohol. Plaintiff advised she took multiple medications for seizures and there had been medication changes but none recently. Plaintiff was hyper-agitated and appeared to be hyperventilating; at times, she was able converse but seemed resistant to do so. Her physical exam manifested many normal findings; however, Plaintiff was agitated with an odd affect. (Tr. 501). Sammy Turner, M.D., noted Plaintiff's tonic spells did not appear to be for a protracted tonic-clonic seizure as she was not particularly postictal (abnormal during her return to baseline). Plaintiff's labs illustrated low carbamazepine (seizure medication) but high alcohol. She was neither homicidal nor suicidal. Plaintiff was diagnosed with seizures and a urinary tract infection. Plaintiff was discharged and instructed to continue her medications and follow up with her physician.

9

On May 2, 2018, Plaintiff was seen at Benton NeuroCare Inc. regarding her seizures. (Tr. 579-582). Plaintiff reported experiencing 1 to 2 seizures per week. (Tr. 581). She was compliant with her medications but reported her VNS was not controlling her seizures. Dr. Al-Khatib found Plaintiff alert, oriented, and with a normal mental status and normal physical exam. She denied lateralizing weakness, numbness, speech dysfunction, visual disturbance, headache, dizziness, drowsiness, spinal pain, radicular pain, gait dysfunction, falls, or syncope. Dr. Al-Khatib diagnosed her with localization-related (focal) (partial) symptomatic epilepsy and epileptic syndromes with complex partial seizures, intractable, without status epilepticus. Plaintiff's VNS device was adjusted, and she tolerated it very well. Dr. Al-Khatib increased Plaintiff's Briviact prescription to 100 mg (morning and evening); refilled Zarontin 250 mg (2 per day) and Trileptal 600 mg (morning and bedtime); and instructed Plaintiff not to drive. (Tr. 581-582).

Plaintiff presented to Cara Hartfield, Ph.D., for a mental diagnostic evaluation on August 1, 2018. (Tr. 571-577). When asked about her disability, Plaintiff reported she had epilepsy and was unable to drive. (Tr. 571). She estimated she has 1600 absence seizures (brief, sudden lapse of consciousness) daily and has tonic-clonic seizures that occur once a week to twice a month. Plaintiff reported being depressed and sleeping only 2-3 hours per night. She reported decreased appetite and energy, and she lacked motivation. She has a history of suicidal ideation with a plan but denied having a plan within the last year. She reports becoming anxious when talking around people and there are times where she feels unable to breath and thinks she might pass out. (Tr. 572). She is hypervigilant; easily startled; has anxiety about having seizures; and "overthinks" things which in turn keeps her awake at night. She reports she was raped by her step-grandfather at the age of 12 and while she does not have daily intrusive thoughts about the experience, if

someone looks like her stepfather, she runs away.  She feels that this has changed her life and is difficult for her to trust others.  (*Id.*).

Plaintiff reports her first tonic-clonic (convulsion) seizure happened at the age of 10 and with anxiety onset at age 16.  She received psychological treatment at Arkansas Children's Hospital in 2012.  (Tr. 572).  She saw a psychiatrist and therapist and was prescribed Ambien and Clexa; however, Plaintiff has no history of mental health hospitalizations and identified no obstacles to getting the treatment she needs.  Plaintiff reported to Dr. Hartfield that her current medications included Celexa, Trileptal, Zarontin, and Briviact.  Plaintiff participates in social groups infrequently and has few friends.  She can manage her money and clarified she is very careful and anxious about the way she spends money.  (Tr. 573).  She takes showers without reminders but needs reminders to take her medications and brush her teeth.  Plaintiff graduated from high school and completed one semester of college.  She was not in special education classes but was allowed extra time on tests due to test anxiety and receive one-on-one instruction due to her seizures.

Plaintiff last worked as a barista for a couple of months until the business closed right before her mental diagnostic evaluation.  (Tr. 573).  She worked as a janitor at the New School for four to five months but was fired for absenteeism.  Plaintiff was a seasonal worker at Toys "R" Us for three months.  She worked at the University of Arkansas selling tickets to sporting events for six months but was fired due to absenteeism.  Plaintiff reported she was able to get along well with coworkers and supervisors.

Plaintiff was brought to Dr. Hartfield's evaluation by her mother.  (Tr. 574).  Plaintiff presented appropriately attired with appropriate hygiene.  Dr. Hartfield noted Plaintiff's pleasant tone and that Plaintiff displayed no resistance nor hostility towards the interview process but was

anxious and apprehensive.  Plaintiff was cooperative but had "spacey moments" during the evaluation during which she appeared unaware of what was being said.  Throughout the evaluation, her speech was logical, relevant, and goal directed.  Plaintiff had a history of suicidal ideation but denied current suicidal or homicidal ideation; did not present with any bizarre or peculiar preoccupations; and denied experience of thought withdrawal, insertion, or control.  No delusions of grandeur, preoccupation, persecution, hypochondria, reference, obsession, paranoia, or violence were elicited.  There was no overt evidence of responding to internal stimuli and Plaintiff denied hallucinations.  Following her examination and consideration of Plaintiff's educational history, nature of prior work, and general level of adaptive functioning, Dr. Hartfield concluded Plaintiff was functioning within the average range of intelligence.  (Tr. 575).

Dr. Hartfield noted Plaintiff had both absence seizures and tonic-clonic seizures since the age of 10, opining that Plaintiff's seizures greatly reduced the number of activities a typical young woman her age might be able to do. (Tr. 575).  Additionally, Plaintiff experiences depressed mood, generalized anxiety, decreased appetite, and decreased energy.  While Plaintiff reported many symptoms, Dr. Hartfield concluded she did not meet the clear diagnostic criteria for any diagnosis other than a generalized anxiety disorder.  Her depressed mood was originally linked to her sexual trauma but appeared to be secondary to her epilepsy and the ways it limited her life.  Dr. Hartfield diagnosed generalized anxiety disorder and unspecified mood disorder and ruled out PTSD.

According to Dr. Hartfield, Plaintiff's mental impairments interfere markedly with her day-to-day adaptive functioning.  (Tr. 575).  Plaintiff is unable to drive and does not shop for the things she needs; however, she can manage her money.  Her capacity to communicate and interact in a socially adequate manner is moderately affected.  (Tr. 576).  She interacted appropriately during the evaluation and reported no difficulty interacting with coworkers and supervisors but

12

experiences anxiety in groups of people and thus, her social interaction is infrequent.  Plaintiff's capacity to communicate in an intelligible and effective manner is unaffected and Dr. Hartfield found her level of verbal intellectual functioning in the average range but that her capacity to cope with typical mental/cognitive demands of basic work-like tasks is moderately affected.  Dr. Hartfield found Plaintiff's level of intellectual functioning within the average range but noted Plaintiff has difficulty coping with stress.  (*Id.*).

With respect to Plaintiff's ability to attend and sustain concentration on basic tasks, Dr. Hartfield found it moderately affected.  (Tr. 576).  Specifically, Plaintiff's capacity to complete work-like tasks within an acceptable timeframe was markedly affected.  No slowing of thought or movement was observed, but the occurrence of absence seizures would very likely affect Plaintiff's pace at work.  She was adequately cooperative and gave no indication of symptom exaggeration.  The symptoms she reported were congruent with her representation and she gave no approximate answer or atypical symptoms.

Plaintiff returned to Benton NeuroCare Inc., on August 30, 2018, for follow-up care for her seizures.  (Tr. 583-586).  She reported having one seizure every three to four weeks and admitted non-compliance with her medications at times.  (Tr. 585).  She denied any side effects from her medications and stated her VNS was not controlling her seizures.  Plaintiff's physical exam was normal, and Dr. Al-Khatib diagnosed her with the following: localization-related (focal) (partial) symptomatic epilepsy and epileptic syndromes with complex partial seizures, intractable, without status epilepticus.  Plaintiff's VNS device was interrogated and adjusted.  Dr. Al-Khatib increased and refilled Briviact 100 mg, refilled Trileptal 600 mg (morning and evening), and refilled Zarontin 250 mg.  (Tr. 586).  Dr. Al-Khatib also stressed the importance of compliance with medications, directed Plaintiff not to drive, and instructed her to follow up in one month.

13

Plaintiff next saw Dr. Al-Khatib at Benton NeuroCare, Inc., on October 24, 2018. (Tr. 598-601). Plaintiff had one seizure since her last appointment on August 30, 2018. (Tr. 600). She admitted missing her medications the day before had been compliant with her medications because her boyfriend reminded her to take them. Plaintiff's physical exam was normal, and Dr. Al-Khatib's impression was intractable complex partial seizure, and status post ("S/P") VNS implant. (Tr. 600-601). Dr. Al-Khatib's diagnoses were unchanged, and Dr. Al-Khatib continued Plaintiff's Briviact 100 mg; refilled Trileptal 600 mg (morning and evening) and Zarontin 250 mg; and continued the prohibition on Plaintiff's driving. Dr. Al-Khatib stressed the importance of medication compliance and informed Plaintiff to follow up on one month. (Tr. 601).

On December 17, 2018, Plaintiff was seen by Angela Chapman, M.D., to establish care regarding her history of PTSD, major depression, and pseudo seizures. (Tr. 699-702). Plaintiff reported her history of sexual abuse by her paternal step grandfather throughout early childhood. (Tr. 699). Plaintiff started to develop chronic symptoms of depression including dysphoria, anhedonia, sleep offset insomnia, distressing dreams, and during in childhood, night terrors. She described feelings of hopelessness and worthlessness; decreased immediate recall; fatigue; and suicidal ideation with a history of three attempts, with the last one at age 15. She avoids going out in public, especially alone, and if she does, she gets hypervigilant and paranoid. Until recently, Plaintiff was using cannabis three times per week to help with her anxiety and reported limited mental health treatment from 2012 to 2013. Plaintiff had been prescribed Celexa but noncompliant. She reported she had started individual therapy with Courtney Goodrum, LCSW, in November 2018. (*Id*.). Plaintiff's appearance was appropriate, but her affect was constricted. (Tr. 701). Her mood was depressed and anxious; however, she was oriented to time, person, place, and situation. Dr. Chapman diagnosed Plaintiff with PTSD, depression, and conversion disorder

14

but ruled out generalized anxiety disorder and borderline personality disorder.  Dr. Chapman discontinued Celexa and added Lexapro, titrated up to 10 mg a day.  (Tr. 701-702).

On December 27, 2018, Plaintiff returned to Benton NeuroCare, Inc. for her seizures.  (Tr. 602-605).  She reported five tonic-clonic seizures since her last appointment; reported having one to two seizures per month; and reported staring and blinking spells despite compliance with medications.  Plaintiff's physical exam was normal except for a ruptured ovarian cyst which was managed by observation.  Dr. Al-Khatib's impression was intractable complex partial-seizure and S/P VNS implant, and his diagnoses were unchanged. (Tr. 605).  Dr. Al-Khatib prescribed Fycompa 2 mg (bedtime) and continued Briviact 100 mg, Zarontin 250 mg, and Trileptal 600 mg (morning and evening).  Dr. Al-Khatib again instructed Plaintiff not to drive.

On the following day (December 28, 2018), Courtney Goodrum, LCSW, completed a mental residual functional capacity assessment on behalf of Plaintiff.  (Tr. 587).  Ms. Goodrum opined Plaintiff has no useful ability to function on a sustained basis in an eight hour work day for five days in a full week in the following areas: maintaining attention and concentration for extended periods; responding appropriately to supervision, co-workers, and usual work setting; working in coordination with or proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; responding appropriately to changes in the work setting; behaving in an emotionally stable manner; relating predictably in social situations; working without deterioration or decompensation causing the individual to withdraw from the

situation; and working without deterioration or decompensation causing exacerbation of symptoms or adaptive behaviors.  (Tr. 587).

On January 7, 2019, Dr. Al-Khatib completed a mental residual functional capacity assessment on behalf of Plaintiff.  (Tr. 588).  Dr. Al-Khatib concluded Plaintiff has no useful ability to function on a sustained basis which is defined as an eight hour work day for five days in a full work week in the following areas:  remembering locations and work-like procedures; understanding, remembering, and carrying out very short simple instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, or being punctual within customary tolerances; and sustaining an ordinary routine without supervision.  Dr. Al-Khatib also completed a physical residual functional capacity assessment that day.  (Tr. 624).  He did not check any statements that could apply to Plaintiff and found no restrictions.

The same date of January 7, 2019, Dr. Al-Khatib completed a physical medical source statement.  (Tr. 625-627).  He opined Plaintiff could frequently lift and/or carry 50 pounds 1/3 to 2/3 of a typical 8-hour workday and stand and/or walk a total of 8 hours in an 8-hour workday. (Tr. 625).  Dr. Al-Khatib posited Plaintiff could sit a total of 8 hours in an 8-hour workday, could take breaks at will, and that she had the unlimited ability to push and/or pull.  Dr. Al-Khatib also noted Plaintiff could perform any work activities in a normal workday based upon the totality of the above symptoms in combination, including side effects of medication for 8 hours in an 8-hour workday.  (Tr. 626).  Dr. Al-Khatib circled "NO" regarding whether limitations were supported by objective findings.  Dr. Al-Khatib further found Plaintiff could climb less than 1/3 in an 8-hour workday and noted the following additional postural limitations for 2/3 of an 8-hour workday: balance; squat; kneel; crouch; bend; and stoop.  Dr. Al-Khatib found Plaintiff could reach in all

directions, handle (gross manipulation), finger (fine manipulation), grip, and feel (skin receptors) 2/3 of an 8-hour workday.   According to Dr. Al-Khatib, Plaintiff should avoid the following concentrated exposures: extreme cold; extreme heat; wetness; humidity; noise; vibration; fumes; odors; dusts; gases; poor ventilation; and hazards (machinery or heights).  (Tr. 627).  Dr. Al-Khatib concluded the physical ability statement was supported by objective findings and/or clinical observations or symptoms.

On January 17, 2019, Dr. Al-Khatib completed a treating physician's report for seizure disorder on behalf of Plaintiff.   (Tr. 606-607).   Dr. Al-Khatib described each type of seizure Plaintiff suffers as an intractable complex partial seizure and opined the frequency of Plaintiff's seizures to be 7 days per week.  (Tr. 606).  Dr. Al-Khatib noted he last examined Plaintiff on December 27, 2018, with observations that she has daily complex partial seizures and one to two generalized tonic-clonic seizures per month.   Plaintiff's most recent seizure happened on December 27, 2018, but Dr. Al-Khatib did not observe it.  Dr. Al-Khatib concluded the following conditions typically occur with the seizures: loss of consciousness; alteration of awareness; postictal antisocial behavior; and convulsive seizure.  Plaintiff's medications were last adjusted on December 27, 2018, and the results of her last EEG were positive for epileptiform activities.

On January 30, 2019, Plaintiff returned to Dr. Al-Khatib after experiencing a tonic-clonic seizure on January 25, 2019.  (Tr. 616-619).  She was having a few staring and blinking spells per week instead of daily.  (Tr. 618).  Plaintiff was tolerating her VNS very well, was compliant with taking her medication, and denied any side effects.   Dr. Al-Khatib increased Fycompa to 4 mg (bedtime) and continued Briviact 100 mg, Trileptal 600 mg (morning and evening), and Zarontin 250 mg.  Dr. Al-Khatib cautioned Plaintiff not to drive.   (Tr. 619).

On February 6, 2019, Plaintiff saw Dr. Chapman for her anxiety, depression, and insomnia. (Tr. 695-698). Plaintiff reported she had tolerated Lexapro but denied any improvement with her depression or anxiety and had worsened insomnia. (Tr. 695). She was compliant with her medication but had difficulty attending individual therapy since she is unable to drive. Plaintiff's appearance was appropriate, her affect was constricted; and her mood was depressed and anxious although she was oriented to time, person, place, and situation. Her memory was impaired immediate. Dr. Chapman diagnosed Plaintiff with PTSD, depression, and conversion disorder. (Tr. 697-698). Dr. Chapman increased Lexapro and added Restoril to Plaintiff's medications. (Tr. 697).

Plaintiff returned to Benton NeuroCare Inc., on February 25, 2019, for a follow-up appointment. (Tr. 620-623). She reported having one to two staring and blinking spells per week instead of daily. (Tr. 622). She also had two tonic-clonic seizures since her last appointment, one on February 1, 2019, and the other on February 21, 2019. (Tr. 622). She was compliant with her medications and denied any side effects; Dr. Al-Khatib increased Fycompa to 6 mg (bedtime) and continued Briviact 100 mg, Trileptal 600 mg (morning and evening), and Zarontin 250 mg. (Tr. 623).

Plaintiff returned to Dr. Chapman on March 20, 2019. (Tr. 691-694). Plaintiff was not compliant with taking Restoril because she disliked taking it when her husband was not home, and he works nights. (Tr. 691). She also had trouble complying with individual therapy. Dr. Chapman noted Plaintiff's neurologist completed a medical marijuana application for her. Plaintiff's appearance was appropriate, but her affect was constricted. (Tr. 693). Her mood was depressed and anxious; her memory was impaired immediate, and her speech was unremarkable. Dr.

18

Chapman added Abilify for persisting depression and provided education regarding the side effects of Abilify. (Tr. 693). Furthermore, Dr. Chapman encouraged compliance with Restoril.

Plaintiff next saw Dr. Al-Khatib on March 25, 2019. (Tr. 631-633). She denied any blinking spells or tonic-clonic seizures since her last appointment and was tolerating her VNS very well. (Tr. 632). She reported compliance with her medications and denied any side effect. Dr. Al-Khatib refilled Fycompa 6 mg (bedtime), Trileptal 600 mg (morning and evening), and Zarontin 250 mg. (Tr. 633). In addition, Dr. Al-Khatib continued Briviact 100 mg and advised Plaintiff not to drive.

Plaintiff presented to Dr. Chapman on April 24, 2019, with less depression symptoms. (Tr. 685-688). Plaintiff was more compliant with Restoril and experienced improvement with her sleep pattern as well. (Tr. 685). Plaintiff's trauma symptoms were unchanged; however, she experienced problems being compliant with individual therapy due to transportation issues.

Plaintiff was seen by Dr. Al-Khatib on June 6, 2019, after having one tonic-clonic seizure two weeks before and missing her medication. (Tr. 634-636). Dr. Al-Khatib refilled Fycompa 6 mg (bedtime), Trileptal 600 mg (morning and evening), Zarontin 250 mg, and Briviact 100 mg and cautioned Plaintiff not to drive. (Tr. 636).

Plaintiff returned to Dr. Chapman on June 26, 2019, with worsening depression, anxiety, and angry outbursts. (Tr. 683-684). Plaintiff had also threatened suicide by overdosing on her medications. (Tr. 683). Consequently, Plaintiff's mother was dispensing her medications. Although Plaintiff was attending individual therapy more routinely, Dr. Chapman reviewed the protocol for pursuing a higher level of care if Plaintiff's suicidal behavior required more intensive treatment. Dr. Chapman diagnosed Plaintiff with severe episode of recurrent major depressive

disorder, without psychotic features, conversion disorder, and borderline personality disorder. (Tr. 683-684). Dr. Chapman ruled out generalized anxiety disorder from her diagnosis. (Tr. 684).

On August 6, 2019, Plaintiff was seen again by Dr. Chapman for treatment regarding her depression, anxiety, and worsening insomnia. (Tr. 679-682). Plaintiff was able to tolerate the higher dose of Abilify with no further angry outbursts or thoughts of suicide. (Tr. 679). She was also compliant with her medications and individual therapy. Dr. Chapman discussed the prospect of getting Plaintiff's dog certified as a service animal because he was beneficial in supporting her and could even be able to assist with her seizure disorder. Plaintiff's appearance was appropriate, but she was depressed, anxious, and her affect was constricted. (Tr. 681). Her insight, concentration/attention, sleep, and appetite were fair; however, her judgement was poor. She did not have suicidal or homicidal ideations and was not delusional or manifest hallucinations. Dr. Chapman diagnosed Plaintiff with PTSD, severe episode of recurrent major depressive disorder, without psychotic features, conversion disorder, and borderline personality disorder. (Tr. 681-682). Dr. Chapman increased Restoril to 30 mg (bedtime) and discussed sleep hygiene techniques. (Tr. 681).

On September 4, 2019, Plaintiff returned to Benton NeuroCare Inc., for a follow-up appointment. (Tr. 637-639). Since Plaintiff's last appointment, she had five tonic-clonic seizures and almost daily episodes of staring off into space. (Tr. 637). She was compliant with her medications and had no side effects. Plaintiff tried to use her VNS magnet, but it did not abort her seizures. Dr. Al-Khatib prescribed Aptiom 600 mg (bedtime) and continued Fycompa 6 mg (bedtime), Briviact 100 mg, Trileptal 600 mg (morning and evening), and Zarontin 250 mg. (Tr. 639). However, Dr. Al-Khatib instructed Plaintiff to consider weaning off Zarontin and to follow up in one month.

20

On September 13, 2019, Plaintiff was admitted to Mercy Hospital Northwest Arkansas after drinking alcohol with her sister and having a seizure. (Tr. 708-749, 752-774). Emergency department notes also revealed Norco was taken in addition to alcohol according to family and EMS. (Tr. 714). Plaintiff had several episodes of purposefully banging her head on the cart and flailing while admitted to the hospital. (Tr. 715). Haley Elizabeth Vo, M.D., arrived at Plaintiff's bedside as Plaintiff flailed her arms and legs. (Tr. 720). Plaintiff then struck Dr. Vo on the arm and was laid back down and then struck her in the stomach. Dr. Vo did not observe anything that looked like seizure activity, though Plaintiff was slightly tachycardic. Intravenous therapy was given with Keppra. (Tr. 715). Plaintiff was monitored for about five hours, was awake, alert, more sober, and had no other abnormal movements. (Tr. 720). Thereafter, Plaintiff's mother and father agreed she was at her baseline. She was subsequently discharged with instructions to follow up with her neurologist and to avoid alcohol. She was advised that assault of a health care provider is a felony.

Plaintiff returned to Dr. Chapman on September 18, 2019. (Tr. 675-678). Plaintiff reported improvement with her depression, anxiety, anger, and insomnia. (Tr. 675). However, she experienced a severe seizure due to being overwhelmed by her emotions. Plaintiff was compliant with her other medications and individual therapy as well. Plaintiff's memory was impaired immediate. Dr. Chapman diagnosed Plaintiff with PTSD, depression, major recurrent, in partial remission, conversion disorder, and borderline personality disorder. No changes to Plaintiff's medications were made and no severe side effects of medications were reported.

On October 16, 2019, Plaintiff returned to Dr. Al-Khatib. (Tr. 640-642). On September 13, 2019, Plaintiff was drinking alcohol and had a seizure like spell. (Tr. 640). She was taken to the hospital, and she had another spell which the emergency room questioned for possible pseudo

21

seizure.  (Tr. 641).  She was given Keppra and Thiamine and denied having any seizure like spells; however, she reported nausea as a side effect from Aptiom and reported not taking Aptiom since mid-September.  Otherwise, she was compliant with her other medications and had no side effects. (*Id.*).  Plaintiff's physical exam was normal, and she was assessed with intractable complex partial seizure and S/P VNS implant.  (Tr. 641-642).  According to labs performed on September 13, 2019, her comprehensive metabolic panel ("CMP") and complete blood count ("CBC") were unremarkable.  (Tr. 642).  Dr. Al-Khatib discontinued Aptiom and instructed Plaintiff avoid alcohol.  In addition, Dr. Al-Khatib continued Fycompa 6 mg (bedtime), Briviact 100 mg, Trileptal 600 mg (morning and evening), and Zarontin 600 mg.  He also advised Plaintiff not to drive.

On November 13, 2019, Ms. Goodrum completed a second mental residual functional capacity assessment on behalf of Plaintiff.  (Tr. 646).  She concluded Plaintiff had no useful ability to function on a sustained basis which is defined as an eight hour work day for five days in a full week in the following areas: maintaining attention and concentration for extended periods of time; working in coordination with or proximity to others without being distracted by them; consistently performing at a normal pace productively in work settings; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; following and/or remembering work rules; behaving in an emotionally stable manner and/or relating predictably in social situations; and working without deterioration or decompensation causing exacerbation of symptoms or adaptive behaviors.  (*Id.*).

Plaintiff next saw Dr. Chapman on November 20, 2019, complaining of depression, anxiety, and insomnia.  (Tr. 671).  Dr. Chapman noted Plaintiff was attending individual therapy. Plaintiff reported worsening depression, anxiety, as well as insomnia claiming it was in part due

to social stressors.  Specifically, Plaintiff claimed she was isolated at home and lived too far out for her friends to visit.  She was unable to drive because of her seizures and experienced problems with attending individual therapy because of transportation issues.  Dr. Chapman noted Plaintiff had been noncompliant with Restoril.  Her affect was constricted, and her mood was depressed, anxious, and angry.  Dr. Chapman diagnosed Plaintiff with PTSD, severe episode of recurrent major depressive disorder, without psychotic features, conversion disorder, and borderline personality disorder.  (Tr. 673-674).  Dr. Chapman ruled out generalized anxiety disorder, increased Plaintiff's Abilify to 10 mg per day to address worsening depression and encouraged compliance with Restoril.  (Tr. 673).

On December 13, 2019, Plaintiff returned to Benton NeuroCare Inc.  (Tr. 643-645).  She had a generalized tonic-clonic seizure on November 24, 2019, and a second one December 9, 2019.  (Tr. 644).  Plaintiff still reported having daily spells of staring off into space and eye blinking, although she was compliant with her medications and denied side effects.  (Tr. 644-645).  Dr. Al-Khatib increased Fycompa to 8 mg (bedtime) and increased Briviact 100 mg to two tabs in the morning and three in the evening.  (Tr. 645).  He also continued Trileptal 600 mg (morning and evening), Zarontin 250 mg, and advised Plaintiff not to drive.

On December 18, 2019, Dr. Al-Khatib completed another physical medical source statement on behalf of Plaintiff.  (Tr. 647-649).  Dr. Al-Khatib opined Plaintiff could frequently and occasionally lift and/or carry 25 pounds 1/3 to 2/3 of a typical 8-hour workday.  (Tr. 647).  She could stand and/or walk 3 hours in an 8-hour workday and continuously stand and/or walk for 2 hours before needing a break.  However, Dr. Al-Khatib concluded Plaintiff could sit for 8 hours in an 8-hour workday and continuously sit for 8 hours before needing a break.  Dr. Al-Khatib further noted Plaintiff's ability to push and/or pull was unlimited and that she would require 1 or 2 work

23

breaks/bathroom breaks out of a typical 8-hour workday.  Dr. Al-Khatib maintained Plaintiff could perform any work activities in a normal workday based upon the totality of the above symptoms in combination, including side effects of medication, for 4 hours in an 8-hour workday and continuously for 2 hours.  (Tr. 648).  Dr. Al-Khatib submitted Plaintiff had the following postural limitations: climb (restricted); balance less than 2/8 hours; squat less than 2/8 hours; kneel less than 2/8 hours; crouch less than 2/8 hours; bend less than 2/8 hours; and stoop less than 2/8 hours. Dr. Al-Khatib also concluded Plaintiff had the following manipulative limitations: reach in all directions for 6/8 hours; handle (gross manipulation) 6/8 hours; finger (fine manipulation) 6/8 hours; grip 6/8 hours; and feel (skin receptors) 6/8 hours.  Plaintiff's environmental restrictions consisted of the following: extreme cold or heat (avoid all exposure); wetness or humidity (avoid all exposure); noise or vibration (limit exposure to less than 2/3 of workday); fumes, odors, dusts, gases, poor ventilation (avoid all exposure); hazards (machinery or heights) (avoid all exposure); no driving as part of work duties (avoid all exposure).  Dr. Al-Khatib reached the above impairment related capacities and limitations due to Plaintiff's poorly controlled intractable seizure disorder. He further affirmed the physical ability statement was supported by objective findings and/or clinical observations or symptoms.  (Tr. 649).

On the same date, Dr. Al-Khatib completed a treating physician residual functional capacity assessment on behalf of Plaintiff.  (Tr. 650).  Due to frequent seizures, Dr. Al-Khatib opined Plaintiff cannot perform part-time work activities of any nature for more than 10 hours in a 40-hour workweek.

## IV.   **Discussion**:

In her appeal brief, Plaintiff raises the following issues for reversal: (1) whether the ALJ fully and fairly developed the record; (2) whether substantial evidence supports the ALJ's RFC

assessment; and (3) whether the ALJ properly assessed Plaintiff's subjective complaints.  (ECF No. 14).  After thoroughly reviewing the record, we agree that a remand is warranted, and we will not address each of these issues.

The record contains substantial medical evidence of medication adjustments made by Plaintiff's treating neurologist and treating psychiatrist, including both changes in medications prescribed and in dosage adjustments.  (Tr. 581-582, 586, 605, 619, 623, 639, 642, 645, 673, 681, 693, 697, 701-702).  Although there are instances when Plaintiff was not compliant with her medications, there are numerous occasions when she was compliant with her medications and still experienced multiple tonic-clonic seizures, PTSD, severe depression, conversion disorder, and borderline personality disorder.  (Tr. 406, 408, 410, 421, 581-582, 585, 600, 604, 618, 622, 632, 634-635, 637, 641, 644, 671, 673-675, 677, 679, 681-682, 683-685, 687-688, 691, 693-695, 697-698, 702).  Dr. Chapman, Plaintiff's treating psychiatrist, ruled out borderline personality disorder at the outset of Plaintiff's treatment (Tr. 693-694, 688, 698, 702); however, as time passed, Plaintiff exhibited major depressive episodes and had consistent diagnoses of borderline personality disorder.  (Tr. 671-674, 677, 679-682, 683-684, 695).  Ultimately, Plaintiff's medical records reveal that her symptoms waxed and waned, and recognition must be given to the instability of mental impairments and their waxing and waning nature after manifestation.  *See Lillard v. Berryhill*, 376 F. Supp. 3d 963, 984 (E.D. Mo. 2019) (citing *Rowland v. Astrue*, 673 F.Supp.2d 902, 920-21 (D.S.D. 2009).

Plaintiff filed her applications for benefits after March 2017.  Therefore, the ALJ's treatment of medical opinion evidence is governed by 20 C.F.R. §§ 404.1520c, 416.920c.[4]  Dr.

---

[4] On January 28, 2017, the Administration promulgated new regulations governing how ALJ's assess medical opinion evidence.  The new rules, with an effective date of March 27, 2017, focus on whether an opinion is persuasive, based on: (1) supportability; (2) consistency with the evidence; (3) relationship with the claimant [which includes; (i) length of treatment relationship; (ii) frequency of examinations; (iii) purpose of the treatment relationship; (iv) extent of the

Hartfield opined Plaintiff's mental impairments would interfere markedly with her day-to-day adaptive functioning and that her ability to attend and sustain concentration on basic tasks is moderately affected. (Tr. 575-576). Furthermore, Dr. Hartfield found Plaintiff's capacity to complete work-like tasks within an acceptable timeframe was markedly affected and the occurrence of absence seizures would very likely affect Plaintiff's pace at work. (Tr. 576). Dr. Al-Khatib also assessed that Plaintiff would have problems maintaining attention and concentration for extended periods, understand, remember, and carry out short simple instructions, maintain regular attendance, and sustain an ordinary routine without supervision. (Tr. 588).

Plaintiff asserts the ALJ rejected Dr. Hartfield's opinion from the mental diagnostic evaluation. (ECF No. 14, p. 4). The ALJ found Dr. Hartfield's opinion partially persuasive; however, she did not explain how she considered either the supportability or consistency factors in determining the persuasiveness of Dr. Hartfield's opinion. Her period use of "consistent" in her cursory treatment of the opinion is insufficient, in the Court's opinion, to satisfy the Regulations' requirement that the ALJ "explain" she considered these factors in determining the persuasiveness of a medical opinion. *See Pipkins v. Kijakazi*, No. 1:20 CV-161-CDP, 2022 WL 218898, at *4 (E.D. Mo. Jan. 25, 2022) (citing *Guess v. Kijakazi*, No. 4:20-CV-887-JTR, 2021 WL 5983193, at *3-4 (E.D. Ark. Dec. 17, 2021). The Court similarly finds the ALJ's opinion did not reveal analysis of whether Dr. Hartfield's opinion was or was not supportable. *See Wilkins v. Kijakazi*, No. 4:20-CV-00938 PSH, 2021 WL 3033343, at *3 (E.D. Ark. July 19, 2021); *see also Starman v. Kijakazi*, No. 2:20-CV-00035-SRC, 2021 WL 4459729, at *4 (E.D. Mo. Sept. 29, 2021). It is unclear how Dr. Hartfield's opinion is inconsistent with the opinions of other medical and non-

---

treatment relationship; and (v) examining relationship]; (4) provider specialization; and (5) any other important factors. *See Howard v. Kijakazi*, No. 3:20-CV-275-JTR, 2021 WL 3617447, at *3 (E.D. Ark. Aug. 16, 2021) (citing 20 C.F.R. § 404.1520c(a)-(c)(2017). An opinion is more persuasive if it is consistent with and supported by the medical evidence as a whole. *Id*. (citing 20 C.F.R. § 416.920c(c)(1)-(2)(2017)).

medical sources as the ALJ did not cite any specific records that are inconsistent with Dr. Hartfield's opinion or specify how, or which, other evidence contradicts Dr. Hartfield's opinion. *See Phillips v. Saul*, No. 1:19-CV-34-BD, 2020 WL 3451519, at *3 (E.D. Ark. June 24, 2020).

At the administrative hearing, Plaintiff's Counsel presented the VE with the following question:

> Dr. Owen, if someone does not have an ability on a sustained basis to remember locations, and work-like procedures, understand, remember, and carry out even very short, simple instructions, and maintain attention and concentration for extended periods, how would that affect the job base?  (Tr. 94).

The VE responded, "I think probably what we'd be looking at this point then would be something like supported employment."  Plaintiff's Counsel then asked, "[w]ould it rule out the three jobs that you listed?"  The VE replied, "[y]es, ma'am, I think it would."  It seems to the Court that the ALJ also failed to properly evaluate Dr. Hartfield's opinion that contained some of these limitations.  *See Pipkins*, 2022 WL 218898, at *4.

Based on the foregoing, the Court finds that remand is necessary for reconsideration of Dr. Hartfield's opinion utilizing the appropriate regulations.  If the ALJ continues to view Dr. Hartfield's opinion unpersuasive, the ALJ should explain why, fully addressing the supportability and consistency factors, as well as any other relevant factors consistent with 20 C.F.R. §§ 404.1520c, 416.920c.

## V.    Conclusion:

Based upon the foregoing, it is recommended that the Commissioner's decision denying benefits be reversed and remanded for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely**

**objections may result in waiver of the right to appeal questions of fact.  We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 1st day of April 2022.

*Christy Comstock*
CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE